Richard V. ALLEN, et al., Plaintiffs,

v.

Gerald P. CARMEN, Administrator of General Services Administration, et al., Defendants.

Civ. A. No. 83–3099.

United States District Court, District of Columbia.

Dec. 30, 1983.

R. Stan Mortenson, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for plaintiffs.

Richard A. Levie, Civ. Div., Justice Dept., Washington, D.C., for defendants.

## OPINION

HOGAN, District Judge.

## I. INTRODUCTION

· The twenty-nine plaintiffs in this suit held White House Staff, Cabinet or policy-making agency positions in the federal government during the Nixon Administration. The defendants are Gerald P. Carmen, the Administrator ("the Administrator") of the General Services Administration ("GSA"), and Robert M. Warner, the Archivist ("the Archivist") of the United States.

Pursuant to the Presidential Recordings and Materials Preservation Act, 44 U.S.C. § 2107 *Note* (1976) ("the Act"), the Administrator is authorized to receive, retain or make reasonable efforts to obtain complete possession and control of documents and other materials which constitute the Presidential historical materials of Richard M. Nixon, covering the period beginning January 20, 1969 and ending August 9, 1974. By virtue of the Act, materials related to Watergate were received as well as documents and other materials created by these plaintiffs relevant to their specific positions. Pursuant to regulations promulgated by the Administrator under the Act, employees of the Archives reviewed and categorized certain materials and prepared them for public access. As administered by the National Archives, public access includes permission to have copies made of the material with no restrictions on the use of those copies.

One of the categories of material reviewed and ready for release to the public are the "White House Special Files." The Special Files were established during the last three years of the Nixon Administration to contain sensitive material. They are a subset of the White House general correspondence files, known as the "Central Files." *See Nixon v. Administrator,* 408 F.Supp. 321, 330 n. 1 (D.D.C.1976), *aff'd,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) and Plaintiffs' Exhibit K to their Cross-Motion for Summary Judgment. The Special Files contain approximately 1.5 million pages of material but represent less than 4% of the entire collection of the Nixon Presidential Materials. *See* Defendants' Responses to Plaintiffs' First Set of Requests for Admission, numbers 16 and 18.

Plaintiffs do not seek to delay the release of Watergate-related material. Rather, because of alleged constitutionally infirm regulations, they seek to prevent the public's access to the Special Files at this time. They claim the documents contained therein are substantially comparable to the materials of the staffs of all other Presidents. They allege that Congress exerted improper influence over the creation and modification of the public access regulations by providing for and extensively exercising the legislative veto provided it under the Act.[1] They urge that Section 104 of the

---

**1.** Section 104(b), which refers to the legislative veto, provides:

[T]he regulations proposed by the Administrator in the report required by subsection (a) shall take effect upon the expiration of ninety legislative days after the submission of such report, unless such regulations are disapproved by a resolution adopted by either House of the Congress during such period. (2) The Administrator may not issue any regulation or make any change in a regulation if such regulation or change is disapproved by either House of the Congress under this subsection.

Act and the regulations promulgated thereunder must be struck down in light of the Supreme Court's recent decision in *Immigration and Naturalization Service v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), which declared the one-house veto unconstitutional. The GSA has set January 3, 1984 as the date on which the public will have access to materials at issue. Defendants have asserted six defenses to this action. Additionally, *amici curiae,* several writers and other individuals interested in the documents to be released, have sought to dismiss this action.

The case has been presented to the Court on cross-motions for summary judgment and defendants' motion to dismiss. On December 16, 1983, the Court heard oral argument on those motions and on plaintiffs' motion for preliminary injunction. The Act requires this case take priority over all others and it has been so treated by all concerned on an expedited basis. For the reasons set forth below, the Court finds that the defenses asserted by the defendant do not deprive this Court of jurisdiction and that, as a matter of law, plaintiffs are entitled to summary judgment that *Chadha* should be applied retroactively with the result that the regulations must fall.[2] On the issue of severability, the Court concludes that the one-house veto provision is severable and thereby rules in defendants' favor on that issue. Based on these rulings, the Court decides it need not reach the issue of improper Congressional influence.

## II. BACKGROUND

### A. *History of the Public Access Regulations*

The Presidential Recordings and Materials Preservation Act was enacted by Congress in December, 1974, largely to nullify an agreement of September 8, 1974 between former President Nixon and then Administrator Arthur Sampson so as to protect and preserve the "Watergate" materials. Under the Nixon-Sampson agreement, all materials in the White House on August 9, 1974 would be deposited temporarily with GSA but the former President would be allowed to have access to them and eventually to withdraw or direct the destruction of materials. Additionally, upon his death, the tapes were to be destroyed immediately. 10 Weekly Comp. of Pres. Doc. 1104 (1974). The Act put an end to this questionable agreement and created, for the first time, strict controls over Presidential materials.

Section 104(a) of the Act provides that the Administrator shall, within ninety days after the date of enactment of this title submit to each House of Congress a report proposing and explaining regulations that would provide public access to the tape

---

(3) The provisions of this subsection shall apply to any change in the regulations proposed by the Administrator in the report required by subsection (a). Any proposed change shall take into account the factors described in paragraph (1) through paragraph (7) of subsection (a), and such proposed change shall be submitted by the Administrator in the same manner as the report required by subsection (a).

Congress' exercise of the legislative veto over the proposed regulations is described in II A, *infra.*

2. This case calls to mind the precepts laid out over 160 years ago by Chief Justice John Marshall who reaches across the centuries to instruct this Court. Justice Marshall wrote:

It is most true, that this court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction, if it should. The judiciary cannot, as the legislature may, avoid a measure, because it approaches the confines of the constitution. We cannot pass it by, because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur, which we would gladly avoid; but we cannot avoid them. All we can do is, to exercise our best judgment, and conscientiously to perform our duty.

*Cohens v. Virginia,* 19 U.S. 264, 403, 6 Wheat. 264, 403, 5 L.Ed. 257 (1821).

recordings and other materials,[3] referred to in section 101. Such regulations shall take into account the following factors:

(1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term "Watergate";

(2) the need to make such recordings and materials available for use in judicial proceedings;

(3) the need to prevent general access, except in accordance with appropriate procedures established for use in judicial proceedings, to information relating to the Nation's security;

(4) the need to protect every individual's right to a fair and impartial trial;

(5) the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials;

(6) the need to provide public access to those materials which have general historical significance, and which are not likely to be related to the need described in paragraph (1); and

(7) the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance.

44 U.S.C. § 104(a).

As required, on March 19, 1975, Arthur Sampson reported to Congress a set of proposed public access regulations. The Senate Committee on Government Operations found that many of the regulations complied with the Act but also determined that there were a significant number of provisions which were not consistent and should be disapproved. S.Res. 244, 94th Cong., 1st Sess. (1975). Since there was no provision for revising or amending the proposed regulations in part, and GSA contended that it would be difficult to implement the remaining, approved regulations, the Committee concluded that it should recommend disapproval of all the regulations to prevent the unacceptable provisions from becoming effective.[4] S.Rep. No. 368, 94th Cong., 1st Sess. 3 (1975).

In particular, the Committee disapproved of the proposed regulation which read:

The Administrator may restrict access to portions of materials determined to relate to abuses of governmental power when the release of those portions would tend to embarrass, damage or harass living persons, and the deletion of those portions will not distort, and their retention is not essential to an understanding of, the substantive content of the materials.

Proposed Reg. § 105–63.402–1 (March 19, 1975). The proposed regulations would also have authorized the Administrator to restrict access to materials of general historical significance unrelated to abuses of governmental power when the release of the materials would "tend to embarrass, damage, or harass living persons." Proposed Reg. § 105–63.402–2 (March 19, 1975).

The Senate Committee found Proposed Reg. 105–63.402–1 unacceptable and commented,

The intent of this restriction is understandable and acceptable: to protect the reputations of living persons from unnecessary embarrassment. To the extent that such concern is legitimate, this regulation seems largely superfluous. Any purely personal items would automatically be exempt from disclosure and per-

---

**3.** Under the Act and proposed regulations, four categories of materials were identified: Presidential historical materials, private or personal materials, those relating to abuses of governmental power popularly identified under the generic term "Watergate" and those of general historical significance. *See* 41 C.F.R. § 105–63.-104.

**4.** For a history of Congressional control exerted over the writing of these regulations, *See* Bruff & Gellhorn, *Congressional Control of Administrative Regulation: A Study of Legislative Vetoes,* 90 Harvard L.J. 1369, 1397–1402 (1977).

haps even retention by GSA. (See sections 105–63.104(b); 105–63.104–5.)

Even if it were not superfluous, the provision would still be objectionable. Almost by definition, the Watergate affairs are embarrassing to those who were associated with them. Therefore, virtually all of the Watergate materials, could, conceivably, be subject to this restriction.

The additional qualification does not remedy the situation. It states only that embarrassing materials will not be withheld if their deletion will not "distort" the Watergate history and if their retention is not "essential" to an understanding of that history. But Congress did not direct that only the "essential" of the Watergate affairs be made public. Congress directed that "the full truth" be made public. This provision would undermine that congressional purpose.

Another problem with the provision is that the Administrator has total, unfettered discretion to determine whether personal matter included within the Watergate materials should be withheld. If the material is personal and not necessary to understand an abuse, the Administrator should be *required* to restrict access.

To remedy this problem, this subsection should be amended as follows:

(b) The Administrator [may] *will* restrict access to any portions of materials determined to relate to [abuses of governmental power when the release of those portions would tend to embarrass, damage or harass living persons, and the deletion of those portions will not distort, and their retention is not essential to an understanding of the substantive content of the materials] *an individual's personal affairs, such as personnel and medical files, if after being given a reasonable opportunity to review the materials, the individual involved expresses, in writing, a desire to withhold such portions from public access: Provided, That if material relating to an abuse of governmental power refers to, involves or incorporates such personal information, the Administrator will make available such personal information, or portions thereof, if such personal information, or portion thereof, is essential to an understanding of the abuse of governmental power.*

S.Rep. No. 368, 94th Cong. 1st Sess., pp. 9–10 (1975). The Committee found that the "tend to embarrass, damage, or harass" language in both proposed regulations was vague and that there were sufficient exemptions under the Act to prevent disclosure of personal information. *Id.* at 11.

In response to the veto, the Administrator submitted a second set of proposed regulations to Congress on October 15, 1975. In place of the provision containing the "tend to embarrass, damage or harass" language, the proposed regulation provided,

The Administrator will restrict access to any portion of materials determined to relate to abuses of governmental power when the release of those portions would constitute a clearly unwarranted invasion of personal privacy or result in the defamation of a living person: Provided, that if materials relating to an abuse of governmental power refers to, involves or incorporates such personal information, the Administrator will make available such personal information, if such personal information, or portions thereof, is essential to an understanding of the abuse of governmental power.

Proposed Reg. § 105–63.402–1(b) (October 15, 1975). With regard to materials of general historical significance unrelated to abuses of governmental power, the proposed regulations provided, in pertinent part, that the Administrator will restrict access when the release of the materials would:

... constitute a clearly unwarranted invasion of personal privacy or result in the defamation of a living person; ...

Proposed Reg. § 105–63.402–2(b)(2) (October 15, 1975).

By letter dated January 21, 1976, Jack Eckerd, Administrator of GSA, explained to the Senate that at the time the proposed regulations were submitted to the Congress, the Government was in the midst of defending a judicial challenge to the constitutionality of the Act.[5] Although the three-judge panel upheld the facial constitutionality of the Act, the Assistant Attorney General determined that the opinion necessitated his further reviewing the constitutionality of at least several of the proposed regulations submitted on October 15, 1975.

On January 22, 1976, Representative Brademas conducted a hearing before the Subcommittee on Printing of the Committee on House Administration, at which Mr. Eckerd, Mr. Rhoads, Archivist of the United States, Donald P. Young, Acting General Counsel of GSA, and Steven Garfinkel, Chief Counsel for Records and Archives, as well as others, testified. Hearing Before the Subcomm. on Printing of the Comm. on House Administration: "Regulations to Implement Title I, Public Law 193–256, the Presidential Recordings and Materials Preservation Act," 94th Cong., 2d Sess. (Jan. 22, 1976) ("The Brademas hearing") (unpublished transcript) (attached as Exhibit B to Plaintiff's Opp. to Defendants' Motion to Dismiss). In that hearing, Representative Brademas and Mr. Young debated whether the regulations under the Act and certain House and Senate rules authorized GSA to withdraw the proposed regulations so that GSA could reevaluate them in light of the intervening court opinion.

During the hearing, Mr. Young expressed his concern that regulations which might later be declared unconstitutional not be presented to Congress at all. Both he and the Solicitor General feared that if they were approved by Congress but subsequently invalidated as a result of litigation, the whole process would be wasteful. *Id.* at 26–28. It was Representative Brademas' position that neither the regulations nor Congressional rules provided for GSA

to withdraw the regulations. In his opinion, the appropriate course would be for GSA to advise Congress of its legitimate concerns about the constitutionality of the proposed regulations, while keeping those regulations before Congress. *Id.* at 27–31. At the hearing, he further remarked,

"In other words, why should we, on this subcommittee, have any more confidence in your capacity to take into account constitutionality of regulations during efforts in 1976 than in efforts in 1975? What have you been doing on the public payroll all this last year? I mean why should we assume that chronology will improve your understanding of your problem?" *Id.* at 31–32.

By letter dated February 5, 1976, the Committee on Government Operations, through Senators Ribicoff and Percy and Representative Brademas, advised that the only action authorized, following submission of proposed public access regulations, and during the 90 legislative day period, was disapproval by either the Senate or the House of Representatives and that there was no provision for withdrawal. On April 8, 1976, once again the Senate disapproved those regulations which provided for restricting access to materials relating to the abuse of governmental power and those of general historical significance. S.Res. 428, 94th Cong., 2d Sess. (1976); *see* S.Rep. No. 94–748, 94th Cong., 2d Sess. (1978).

On April 13, 1976, Administrator Eckerd proposed a third set of public access regulations. The House then exercised its veto with respect to certain of these regulations. H.Res. 1505, 94th Cong., 2d Sess. (1976); *see* H.R.Rep. No. 94–1485, 94th Cong., 2d Sess. (1976). Of the six proposed regulations disapproved by the House, two of the provisions dealt with the standards under which the Administrator could limit public access to those materials relating to the abuses of governmental power and those of general historical significance. With regard to materials related to abuses of gov-

5. The Administrator was referring to *Nixon v. Administrator,* 408 F.Supp. 321 (D.D.C.1976), aff'd, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). See discussion at Section II B, *infra.*

ernmental power, the part of the regulations proposed and disapproved provided, ... The Administrator will restrict access to any portion of materials determined to relate to abuses of governmental power when the release of those portions would constitute a clearly unwarranted invasion of personal privacy or constitute libel or slander of a living person: Provided, that if material related to an abuse of governmental power refers to, involves or incorporates such personal information, the Administrator will make available such personal information, or portions thereof, if such personal information, or portions thereof, is essential to an understanding of the abuses of governmental power.

Proposed Reg. § 105–63.402–1(b) (April 13, 1976). With regard to materials of general historical significance unrelated to abuses of governmental power, the regulations proposed and disapproved provided, in pertinent part,

... The Administrator will restrict access to materials of general historical significance, but not related to abuses of governmental power, when the release of these materials would:

. . . . .

(2) constitute a clearly unwarranted invasion of personal privacy or constitute libel or slander of a living person; ...

Proposed Reg. § 105–63.402–2(a)(2).

On June 2, 1977, Administrator Joel W. Solomon submitted a fourth set of regulations which neither House vetoed; these became effective on December 16, 1977. *See* 42 Fed.Reg. 63626–29 (1977) (attached as Appendix I to this Opinion). Shortly after the regulations became effective, former President Nixon challenged their validity on several grounds, including the claim that Section 104 of the Act unconstitutionally permits a one-house veto. *Nixon v. Freeman*, C.A. 77–1395 (D.D.C. January 31, 1978), *aff'd*, 670 F.2d 346 (D.C.Cir.),

*cert. denied*, 459 U.S. 1035, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982).

In exchange for certain revisions in the regulations, former President Nixon withdrew several of the claims presented to the District Court, including the issue of the constitutionality of the one-house veto.[6] Pursuant to the settlement of those claims, a fifth set of regulations was proposed to Congress. These were not vetoed by either house of Congress and became effective on March 7, 1980. *See* 45 Fed.Reg. 14855–60 (1980) (to be codified at 41 C.F.R. §§ 105–63.1, 63.4) (attached as Appendix II to this Opinion). Under this set of regulations, the Administrator was authorized to restrict access to Watergate materials and those of general historical significance when release would "constitute a clearly unwarranted invasion of personal privacy or constitute libel of a living person." 41 C.F.R. §§ 105–63.402–1. With respect to the Watergate materials, the fifth set of regulations contained the proviso, as had the fourth set of regulations, that authorized the Administrator to make available personal information that was essential to an understanding of the abuses of governmental power.

The fifth set of regulations revised the definition of "private or personal materials". Under the new definition, materials relating to a person's family or other non-governmental activities, including private political associations were included but the materials of Mr. Nixon or his staff related to the constitutional or statutory powers or duties as President or as a member of the President's staff were excluded. 45 Fed. Reg. 14856 (March 7, 1980). This set of regulations also provided that the Administrator would give priority to the processing and return of private and personal materials and in the initial archival processing to materials relating to abuses of governmental power. *Id.* at 14857.

Pursuant to the regulations[7] promulgated under the Act, persons[8] were entitled to

---

**6.** See discussion at II B, *infra.*

**7.** 41 C.F.R. § 105–63.401(b) provides:
 (b) Within 30 days following publication of the notice prescribed in § 105–63.401(b), offi-

cers of any Federal, State or local court and other persons who believe that public access to any of the materials may jeopardize an

notice of the proposed opening of those materials. On August 12, 1983, a Federal Register notice advised that anyone having a legally or constitutionally based claim that would prevent or limit public access to the material should file that claim by September 12, 1983. 48 Fed.Reg. 36655 (Aug. 12, 1983). The deadline subsequently was extended to November 10, 1983. 48 Fed. Reg. 40561 (Sept. 18, 1983) and to January 3, 1984. 48 Fed.Reg. 51533 (November 9, 1983).

### B. *Review of Decisions in the Nixon Suits*

A brief overview of the prior litigation under the Act will serve to bring into sharper focus the issues presented in this case. In *Nixon v. Administrator*, 408 F.Supp. 321 (D.D.C.1976), former President Nixon challenged the constitutionality of the Presidential Recordings and Materials Preservation Act before a three-judge panel. At the outset of its analysis that court emphasized that the issue before it was narrow. *Nixon, supra,* 408 F.Supp. at 334. The Court framed the issue as whether "the regulatory scheme enacted by Congress was unconstitutional without reference to the content of any conceivable set of regulations falling within the scope of the Administrator's authority under section 104(a)." *Id.* at 334–35. Since at the time the case was presented to the Court the initial set of regulations had been disapproved by the Senate and no other set of regulations had yet become effective, the Court had no set of regulations which

presented the basis for a live and concrete controversy. Judge McGowan opined however that, "[w]hen regulations finally become effective, however, they could, if drafted with careful attention to the directive of subsection 104(a)(5) [9] eliminate the basis for some of the allegations raised by Mr. Nixon that his rights will be infringed." *Id.* at 335. The Court concluded that only the constitutionality of the process of reviewing and classifying the materials was properly before it. *Id.* at 339. The Court therefore ruled it would only discuss "questions directed toward the statute on its face and aspects of the screening process that, in their broadest outlines, [...] will necessarily be included in any processing conducted under a valid set of regulations." *Id.* at 340.

Former President Nixon challenged the Act on separation of powers, presidential privilege, right of privacy and other grounds. The first three grounds are relevant to this litigation. With regard to the first two claims, the former President contended that the Act represented an unconstitutional invasion of the executive sphere by Congress and infringed the presidential privilege to protect the "generalized interest in free and candid communication to the President in the formulation of Executive Policy." *Id.* at 343.[10] After balancing the intrusion of archival screening on the former President with the objectives of the Act, the Court concluded that intrusion would be minimal. *Id.* at 346.

---

individual's right to a fair and impartial trial should petition the Administrator setting forth the relevant circumstances that warrant withholding specified materials. The Administrator will notify the petitioner by certified mail, return receipt requested, of his decision regarding public access to the pertinent materials. If that decision is adverse to the petitioner, the Administrator will refrain from providing public access to the pertinent materials for at least 30 calendar days from receipt by the petitioner of such notice.

**8.** At oral argument, counsel represented to the Court that only 19 of the 29 plaintiffs had received such a notice.

**9.** That section provides for the rights of individuals to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials. See discussions of this requirement at Section III B, III C, *infra.*

**10.** The Court noted that it had no occasion to consider any common law privilege protecting executive confidentiality encompassed in confidential communications involving executive officials other than the President. *Nixon, supra* at 343 n. 25.

With regard to Mr. Nixon's claim that the process of screening violated his right to privacy, the Court concluded that Mr. Nixon's privacy claim could not be sustained. *Id.* at 364. The Court found that he had no reasonable privacy expectation in most of the documents and conversations and that a very high percentage of them would be related to government interests served by the Act. Without fully considering the issue the Court did note that the second set of proposed regulations (which established the "clearly unwarranted invasion of personal privacy, or defamation of a living person" standard for limiting access) would "provide not insignificant protection of personal privacy." *Id.* at 358 n. 52. Resolution of Mr. Nixon's privacy claims was more difficult than those regarding the presidential privilege. The Court explained that,

> [o]n balance, we believe the congressional act here is a reasonable response to the difficult problem caused by the mingling of personal and private documents and conversations in the midst of a vastly greater number of non-private documents and materials related to government objectives. The processing contemplated by the Act—at least as narrowed by carefully tailored regulations—represents the least intrusive manner in which to provide an adequate level of promotion of government interests of overriding importance.

*Id.* at 367. Former President Nixon also asserted that the Act invades the "private formulation of political thought critical to free speech and association." *Id.* at 367–68. The Court rejected this claim as well finding that countervailing governmental interests prevailed over these concerns insofar as screening of the documents was concerned. *Id.* at 368. Again, the Court commented in a footnote that the public access regulations provided for restrictions on materials implicating "personal privacy," and speculated that "it is entirely pos-

sible to read personal privacy so as to include the privacy in political association protected by the First Amendment, and, if this were the case, then these regulations would be inconsistent with plaintiff's assumption." *Id.* at 368 n. 65.

The Supreme Court affirmed the three-judge court decision in *Nixon v. Administrator*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), both in terms of the lower court's delineation of the narrow issue presented and its rulings on each of the constitutional issues presented thereunder. The Supreme Court also endorsed the lower court's view that proper public access regulations could adequately protect those interests of concern to the former President. *See e.g., Nixon, supra* at 450, 97 S.Ct. at 2793 (regarding executive confidentiality). In his concurring opinion, Justice Powell expressed similar views. *Nixon, supra* at 502 n. 5, 97 S.Ct. at 2820 n. 5. With vision spanning six years and with this litigation surely in mind, Justice Powell concluded,

> Today's decision is limited to the facial validity of the Act's provisions for retention and screening of the materials. The Court's discussion of the interests served by those provisions should not foreclose in any way the search that must yet be undertaken for means of assuring eventual access to important historical records without infringing individual rights protected by the First, Fourth, and Fifth Amendments.

*Id.* at 504, 97 S.Ct. at 2821.

Shortly after the fourth set of regulations became effective, former President Nixon amended his complaint in *Nixon v. Solomon*, Civil Action No. 77–1395 (D.D.C. 1978)[11] to challenge, as plaintiffs have challenged here, the constitutionality of the one-house legislative veto provision and the exercise of Congressional influence over the promulgation of the regulations. In

---

**11.** The action filed in 1977 challenged regulations promulgated earlier. His second amended complaint, filed January 31, 1978, contains several of the challenges presented here. The cap-

tion of this case later changed to *Nixon v. Freeman.* The case shall be referred to by both captions throughout this opinion.

settlement of part of that case, those claims were dismissed.

The settlement agreement provided for certain amendments to the regulations and for the priority processing of private or personal materials. The settlement agreement reflected that the President would not "contend that the regulations are unconstitutional or void because promulgated subject to the one-house veto provision of the Act and in exchange the defendants [will] not contend that congressional acceptance of the regulations supports their validity." Settlement Agreement, § 5. The agreement provided that former President Nixon would not be barred from challenging, on any grounds, regulations which were deleted, amended or newly promulgated. *Id.* at § 6. The agreement was not to operate as a bar to any party "from presenting any and all claims, defenses or arguments there may be to sustain the validity of the challenged regulations or to invalidate the regulations as subsequently modified in response to a successful challenge thereto." *Id.* at § 6.

The District Court granted summary judgment for the defendants on other grounds and the Court of Appeals affirmed that decision in *Nixon v. Freeman*, 670 F.2d 346 (D.C.Cir.1982). The Court of Appeals for the District of Columbia Circuit held that the public access regulations could not be invalidated on the grounds that they invaded former President Nixon's right of privacy. The Court reasoned that expectation of privacy could attach to "diaries or other communications respecting personal matters unrelated to his public duties, but not in materials relating to the conduct and official duties of the Presidency." *Id.* at 354.

### III. ANALYSIS

Defendants have moved to dismiss this case on the grounds that plaintiffs are barred by laches, lack standing and have failed to exhaust their administrative remedies. *Amici* urge the Court, as well, to dismiss the case. They seek summary judgment on the grounds that *Chadha*

should not be applied retroactively, that the power to promulgate public access regulations is severable from the legislative veto provision of the Act and that there was no impermissive congressional influence exerted over the creation and modification of the regulations. Plaintiffs have opposed defendants on the motion to dismiss grounds and have asserted that they are entitled to summary judgment on the grounds of *Chadha*, retroactivity, severability and congressional influence.

### A. Laches

Defendants and *amici* assert that plaintiffs' claims are barred by laches since plaintiffs could have challenged the legislative veto at the time the first legislative veto was exercised, in 1975, and unquestionably should have done so when the fourth set of regulations became effective in December, 1977.

*Amici* seek release of the materials because of the unique historical value of the documents. In their motion to dismiss *amici* allege that this case is just another effort by former President Nixon and his aides "to frustrate the objectives of the Presidential Materials Act" and question why the plaintiffs had never joined in any of the previous suits brought by Nixon. Plaintiffs contend that they only recently became aware of the nature of documents that will be made accessible to the public and have submitted numerous uncontroverted affidavits supporting those contentions. Additionally, plaintiffs claim that laches is not an appropriate defense to an action seeking to vindicate constitutional rights and that by virtue of language in the regulations providing for a 30 day period for filing claims after being notified of opening, the government has waived any challenge to the regulations which are brought within that 30 day period.

■ The burden of proving the affirmative defense of laches logically rests with the defendant. To support a defense of laches, the defendant must offer evidence that the plaintiff unreasonably delayed in challenging defendant's action and that the

defendant has been prejudiced by the delay. *Independent Bankers Ass'n v. Heimann*, 627 F.2d 486, 488 (D.C Cir.1980) (per curiam); *Environmental Defense Fund v. Alexander*, 614 F.2d 474, 478 (5th Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). This Circuit has also explained that "laches does not depend solely on the time that has elapsed between the alleged wrong and the institution of suit; it is 'principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties,' *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 843 (D.C.Cir.1982), *citing, Galliher v. Cadwell*, 145 U.S. 368, 373, 12 S.Ct. 873, 875, 36 L.Ed. 738 (1892). And in *Randall v. Mayor & City Council of Baltimore*, 512 F.Supp. 150 (D.Md.1981), the District Court for Maryland explained, "[i]n the end, the court weighs the excuse, or absence of excuse, against the actual or reasonably anticipated injury." *Id.* at 152, *quoting, Giddens v. Isbrandtsen Co.*, 355 F.2d 125, 128–29 (4 Cir.1966).

When government action is challenged, the element of plaintiff's knowledge must be closely analyzed. "When government action is involved, members of the public are entitled to assume that public officials will act in accordance with the law," *Save Our Wetlands, Inc. v. U.S. Army Corps of Engineers*, 549 F.2d 1021 (5th Cir.), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977). The Fifth Circuit Court of Appeals found in *Environmental Defense Fund* that "the government must show that those whom it seeks to bar by invoking laches were or should have been aware of the questionable nature of the government activity." *Environmental Defense Fund, supra* at 479. In *City of Davis v. Coleman*, 521 F.2d 661, 677 (9th Cir.1975), the Ninth Circuit recognized that where the law on plaintiff's claims is so complex or uncertain, it should be reluctant to charge the plaintiff with the knowledge that would impose a duty to act. "An indispensible element of the lack of diligence is knowledge, or reason to know, of

the legal right, assertion of which is 'delayed.'" *Id.* at 677.

■ The Court has before it the affidavits of many of the plaintiffs. Without exception they state that until August of 1983 they were unaware of the nature of the documents scheduled to be opened. Additionally, while some of them knew, through various forms of media that former President Nixon was litigating his claims to Watergate and other documents, they were not specifically aware of the legal bases for the claims asserted including the challenge to the legislative veto. Defendants argue that the Court is not presented with unsophisticated plaintiffs here. The Court could not agree more. Defendants urge that, since most of the plaintiffs had served in prior administrations, they should have been more attentive to the treatment of their papers. For precisely that reason the Court finds persuasive plaintiffs' affidavits which indicate that they expected the documents they prepared, as staff members during the Nixon administration, to be treated no differently than they had been during other administrations. On the record before the Court, plaintiffs acted diligently once they became aware of how their papers would be treated. The recent decision by the Supreme Court in *Chadha* was the first time the Supreme Court had definitively decided the one-house veto question. This Court is reluctant to charge the plaintiffs with laches when the law has been so unsettled and complex.

■ The second element a defendant must demonstrate to succeed on the laches defense is that it has been prejudiced due to plaintiff's delay. Assuming for the purposes of discussion that plaintiffs have delayed, which the Court has not found, was there prejudice to the defendant and was it suffered as a result of plaintiff's inaction? On the element of prejudice, the Court must balance "the expenditures made by the defendants against the benefits claimed if their efforts were halted," *Environmental Defense Fund, supra* at 479. In *Con-*

*cerned About Trident v. Schlesinger,* 400 F.Supp. 454, 478 (D.D.C.1975), Judge Hart explained that there are two types of prejudice that a defendant may suffer when a plaintiff delays unreasonably in presenting a claim. A defendant may suffer because there is a loss of evidence supporting defendant's position or because he has changed his position in a manner that would not have occurred but for plaintiff's delay. While the amounts expended by the defendant may be large, this does not tilt the scales if it represents a small percentage of the total expenditures anticipated. *Environmental Defense Fund, supra* at 480. In *Environmental Defense Fund,* the Court found that a laches defense would be supported if defendant demonstrated that what it had done would have to be undone. Conversely, where the acts performed by a defendant up to the time of plaintiff's challenge have utility independent of the remainder of a project, prejudice will be more difficult to demonstrate. *See e.g., Committee to Stop Route 7 v. Volpe,* 346 F.Supp. 731, 739 (D.Conn.1972).

Defendants have presented two declarations of Robert M. Warner indicating that the government has expended approximately $1,674,200 and 166,400 hours in processing the Special Files. Defendants assert that because those files, as an entity, have been processed, there is no processing left to be completed with respect to plaintiffs' interests asserted here. The relevant ratio, the Court finds is that of the Special Files to all of President Nixon's files. The Special Files segment represents only 4%. The Court does not minimize the time and money spent by the government in processing the files. The plaintiffs' challenge here is to the presentation, under the current regulations, to the public of those documents, not to the method by which they were processed. Indeed, plaintiffs would be precluded from challenging the processing of the documents since that issue has been decided by the three-judge district court and the Supreme Court opinions. Defendants have offered no concrete credible evidence that the processing which has taken place would have no independent utility in the event that plaintiffs prevail on their claims. Viewing the facts in a light most favorable to the plaintiffs, as it must on a motion to dismiss, the Court finds that plaintiffs are not barred by laches from presenting their constitutional claims.

## B. *Standing*

█ Defendants claim that plaintiffs lack standing because their injuries are only speculative and not related to the alleged illegal action of the defendants. They urge that, until objections presented by these plaintiffs have been overruled and release is imminent, plaintiffs' allegations, derivative as they are, will be premature. *Amici* contend that plaintiffs have no privacy interest in the non-Watergate-related materials at issue in this case and that the nature of the materials exceeds any privacy interest claimed by plaintiffs. These arguments miss the point. Plaintiffs are not seeking to relitigate the rights of former President Nixon which the Courts have already considered. They are clearly seeking to protect their own rights, recognized in the Act and all regulations promulgated thereunder, which allowed them to assert any privacy or constitutional claims. The Courts who have ruled on former President Nixon's claims have, as well, recognized that other individuals had interests to be protected. *See e.g., Nixon v. Administrator,* 408 F.Supp. 321, 343 n. 25; *Nixon v. Administrator,* 433 U.S. 425, 502 n. 5, 97 S.Ct. 2777, 2820 n. 5, 53 L.Ed.2d 867 (Powell, J., concurring). Clearly, the Act and regulations have contemplated their protection. *Capital Legal Foundation v. Commodity Credit Corp.,* 711 F.2d 253, 259 (D.C.Cir.1983); *accord Gull Airborne Instruments v. Weinberger,* 694 F.2d 838 (D.C.Cir.1982). It is also clear that plaintiffs have standing to vindicate threatened injury. *Valley Force Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700. As individuals sought to be protected by the Act and recognized as having protectable rights under the Act, by earlier courts, these plaintiffs have standing.

## C. *Exhaustion of Administrative Remedies*

Defendants contend that this Court is barred from hearing this suit since plaintiffs have not followed the administrative procedure set forth in the Act for asserting their privacy or constitutional claims. Plaintiffs argue they should not be forced to comply with illegal procedures developed by a Congress which exerted pressure via the unconstitutional legislative veto. They seek to have this Court rule on the constitutionality of the regulations; if the regulations are invalidated, they will not be required to comply with the administrative procedure established thereunder.

 There are three purposes served by requiring exhaustion of administrative remedies: 1) it allows the agency to apply its expertise and to exercise its discretion in appropriate circumstances; 2) it aids the court by allowing the agency to make a factual record; 3) it prohibits repeated interruption of the agency proceeding and increases the possibility that an individual's rights may ultimately be vindicated at the agency level. *Athlone Industries v. Consumer Product Safety Commission,* 707 F.2d 1485 (D.C.Cir.1983). This Circuit has recently explained that "[W]hen the reasons supporting the doctrine [of exhausting administrative remedies] are found inapplicable, the doctrine should not be blindly applied." *Athlone Industries, supra,* at 1488, *citing, Committee for GI Rights v. Callaway,* 518 F.2d 466, 474 (D.C.Cir.1975). Not only must the purposes of the doctrine be considered but there must be a consideration of the particular administrative scheme involved. *McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). It is also true that one of the recognized exceptions to the general rule requiring exhaustion of administrative remedies is when resort to the nonjudicial remedy would "clearly and unambiguously violate statutory or constitutional rights." *Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund,* 693 F.2d 290, 293 (3rd Cir.1982). This is the gravamen of plaintiffs' complaint. The Act's administrative scheme permits the agency to rule on an individuals' claim that release of certain documents will infringe his or her constitutional rights. This is not the type of claim presented to this Court and therefore there is not a need to defer to the agency for purposes of its developing an adequate record. Plaintiffs challenge the effect which the exercise of the legislative veto had on the promulgation of regulations. This is a far different claim than would or could be presented before the GSA. Plaintiffs' position is buttressed by the statute's express provision in Section 105(a) for this Court's jurisdiction to hear challenges to the constitutionality of the Act or its regulations.

A distinction made by the Third Circuit Court of Appeals in *Republic Industries, supra,* is relevant. There the Court discussed the type of constitutional tasks delegated to an agency and those delegated to the courts. "[While] we commit to administrative agencies the power to determine constitutional applicability, [but] we do not commit to administrative agencies the power to determine constitutionality of legislation." *Id.* at 295, *citing,* 3 K. Davis, Administrative Law Treatise § 20.04 at 74 (1958). In this case, the agency would be asked to determine whether the release of specific documents would violate certain privacy or constitutional rights. The agency's expertise does not extend, however, to determining the constitutionality of the Act or its regulations.

 While reluctant to jump into the briarpatch of constitutional questions, this Court believes that a ruling on the constitutionality of these regulations, in light of plaintiffs' claims, is necessary to the proper disposition of the case. *Harmon v. Brucker,* 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958). The fact that there is a possibility of alternative relief does not detract from this Court's decision. *See Immigration and Naturalization Service v. Chadha,* — U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Furthermore there would be no purpose served by delaying consideration of this issue. *Cf. Griffin v. County Sch.*

*Bd.*, 377 U.S. 218, 229, 84 S.Ct. 1226, 1232, 12 L.Ed.2d 256 (1964); *Lister v. Lucey*, 575 F.2d 1325, 1331 (7th Cir.), *cert. denied*, 439 U.S. 865, 99 S.Ct. 190, 58 L.Ed.2d 175 (1978).

The Courts' ruling that plaintiffs need not first exhaust their administrative remedies is not inconsistent with *Nixon v. Sampson*, 580 F.2d 514 (D.C.Cir.1978), a case cited by defendant in support of its position. In that case the Court of Appeals considered the district court's granting of a summary judgment in favor of Rose Mary Woods who sought solely to recover her personal materials and papers collected from the White House. Chief Judge Bazelon explained that since there was an elaborate regulatory scheme that would provide her with access to her papers that she should follow that scheme and not bypass it by initially bringing suit in the District Court. *Id.* at 520 n. 11. The distinction between the basis of Ms. Wood's suit and this suit needs no further elaboration.

### D. *Retroactivity*

Plaintiffs seek to have this Court apply *Immigration and Naturalization Service v. Chadha*, —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), retroactively to invalidate the one-house veto provision and the public access regulations promulgated thereunder. In *Chadha*, the Supreme Court held that Section 244(c)(2) of the Immigration and Nationality Act was unconstitutional. Pursuant to that section, either house of Congress could pass a resolution stating that it did not favor suspending the deportation of an alien. By exercising a legislative veto in this manner it could overrule the Attorney General's recommendation that deportation be suspended. The Supreme Court held that the provision for a one-house legislative veto violated the presentment clauses and the bicameral requirements found in Article I of the Constitution. Because the Supreme Court was silent on whether its ruling should be applied retroactively, and because the Constitution neither prohibits nor requires retrospective relief, *Linkletter v.*

*Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965) each court must make that determination based on an analysis of the case and statute before it.

Generally, a court must evaluate three factors when it considers whether to apply a rule retroactively. *Chevron Oil v. Huson*, 404 U.S. 97, 106–110, 92 S.Ct. 349, 355–357, 30 L.Ed.2d 296 (1971). The first of these considerations is whether the decision has announced a new principle of law. *Chevron Oil, supra* at 106, 92 S.Ct. at 355. A new principle of law has been announced when there "is such an abrupt and fundamental shift in doctrine so as to constitute an entirely new rule which in effect replaced an older one." *Hanover Shoe Inc., v. United Shoe Machinery Corp.*, 392 U.S. 481, 498–99, 88 S.Ct. 2224, 2234–35, 20 L.Ed.2d 1231 (1968). Similarly, a new rule is announced when a court decides an issue of first impression whose resolution was not clearly foreshadowed. *Chevron Oil, supra* 404 U.S. at 106, 92 S.Ct. at 355.

Applying the first factor, the Court finds that although *Chadha* was undoubtedly a controversial decision with far-reaching consequences, it was not the type of decision that constituted an entire break with the past or one that was not foreshadowed. As the Supreme Court recognized and the parties conceded, the validity of the one-house veto has long been debated among lawyers. Those who expressed concern over its validity before *Chadha* did so for precisely the same reasons on which the Supreme Court relied in ruling it unconstitutional. *See e.g. American Fed. of Gov. Employees v. Pierce*, 697 F.2d 303 (D.C. Cir.1982) (per curiam); *Consumer Energy Council of America v. FERC*, 673 F.2d 425 (D.C.Cir.1982), *aff'd sub nom. Process Gas Consumers Group v. Consumer Energy Council of America*, —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983).

Plaintiffs urge that this Circuit's decision in *Zweibon v. Mitchell*, 606 F.2d 1172 (D.C. Cir.1979), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981) should control the analysis on this factor. In that

case, members of the Jewish Defense League who had protested the Vietnam War, sued for damages they sustained from the warrantless wiretapping of their offices. The District Court failed to apply the rule announced in *United States v. United States District Court (Keith)*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) retroactively to the suit and thereby precluded plaintiffs from relief. In *Keith*, the Supreme Court held that the requirement of a warrant to conduct a wiretap was not excused because the government sought to protect national security. The United States Court of Appeals for the District of Columbia reversed the District Court. The Court of Appeals did not consider that *Keith* announced a new rule; rather it only extended the constitutional warrant requirement to national security situations. *Zweibon, supra*, at 1179. The *Keith* decision did not represent a new application of a requirement that was not already clear from the four corners of the Constitution. Rather, it announced a rule that had been explained by many decisions interpreting the same requirement. Clearly, while the *Keith* decision addressed an issue of first impression, it was not one whose resolution was not clearly foreshadowed under *Chevron Oil supra*, nor one that constituted an abrupt and fundamental shift in doctrine so as to constitute an entirely new rule under *Hanover Shoe*. Therefore, the *Zweibon* decision is not totally analogous to this case where there is a mandate from the four corners of the Constitution but a paucity of subsequent but pre-*Chadha* decisions interpreting that requirement to invalidate portions of statutes containing a one-house veto provision. However, the distinction between the application of the *Keith* rule in the *Zweibon* case from the *Chadha* rule in this case on the grounds that there were intervening judicial decisions anticipating *Keith* does not counsel a different result. In this case there is a statute which on its face, directly contradicts the presentment and bicameral requirements of the Constitution. Legal scholars had long advanced this position. Intervening decisions could only have

served to underscore what was already apparent from a comparison of the constitutional requirements and the terms of the statute. For this reason, the Court cannot find that *Chadha* really represents new law. In place of judicial decisions holding that the legislative veto was unconstitutional, there had been sufficient discussion well known to the defendants of precisely those considerations that the Supreme Court found persuasive in deciding *Chadha*.

Under *Chevron Oil*, a court must secondly consider whether applying a rule retroactively would further the purpose of the rule. Defendants suggest that this Court examine the Supreme Court's recent, far-reaching decision in *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), in which the Supreme Court held that bankruptcy courts are unconstitutionally organized but declined to apply its ruling retroactively to invalidate prior decisions of the bankruptcy courts. The Court instead held that its ruling should only apply prospectively. The Court agrees with plaintiff that *Northern Pipeline* is not particularly instructive.

First, it is clear that the Supreme Court was very concerned about the substantial inequitable result that retroactive application of its holding in *Northern Pipeline* would generate. Under *Chevron Oil*, the effect of retroactive application is a separate factor to consider and one which the Court will address *infra*. Second, in *Chadha*, the Supreme Court did not discuss whether its ruling would be applied either retroactively or prospectively; it was silent. From this silence this Court infers that the Supreme Court intended that the decision of whether to apply *Chadha* retroactively should be made on a case-by-case basis. The Court finds that in the context of these particular proceedings, a retroactive application of the *Chadha* decision would further its purposes. The Court is presented here with a case in which exercise of the one-house veto was considerably more pervasive than it had been in *Chadha*. In this case, over the course of five

years, regulations proposed by the Administrator underwent revisions directly as a result of the exercise of the veto and Congressional direction during the agency's preparation of the regulations. Anyone who even briefly reviews the legislative record filed by the defendants and supplemented by the plaintiffs cannot conclude otherwise. In essence, Congress through the action of one house or the other, continually rewrote the regulations at issue here. While the one-house veto provision undoubtedly was useful in allowing Congressional oversight to ensure that the purposes of the Act were furthered, "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *Chadha*, at 103 S.Ct. 2780.

The Court's finding on this factor is bolstered by its consideration of the third *Chevron Oil* factor. For the Court to find that there would be substantial inequitable results from applying *Chadha* retroactively, it would have to ignore the prior challenge to this Act by former President Nixon in *Nixon v. Freeman.* During the discovery phase of that case, GSA essentially admitted that the one-house veto provision was unconstitutional. Additionally, it admitted that the content of the regulations were influenced by the House of Representatives members and House staff members and that the fourth set of regulations were, "in part or in whole," the product of the exercise of the Congressional one-house veto provided by Section 104(b) of the Act. See, Fed. Defendants' Response to Plaintiffs First Request for Admissions, *Nixon v. Solomon*, Civ. No. 77–1395 and Answer, paragraphs # 13–15; Plaintiffs' Exhibits on Cross-Motions for Summary Judgment A, D and E respectively. Despite its acknowledgment, it nevertheless continued to process materials under the Act. Additionally, the Court has earlier found that there is no credible evidence presented by the defendants that if the regulations were invalidated, completed screening and processing would have to be undone. For this reason, the Supreme Court's analysis of the preju-

dice from its decision in *Northern Pipeline* is distinguishable. Based on this Court's ruling, what will have to be revamped are the regulations themselves unfettered by any untoward Congressional influence because of the one-house veto provision.

## IV. SEVERABILITY

### A. Vitality of the Regulations

■ Defendants contend that regulations promulgated under Section 104 are not constitutionally void because the legislative veto provision is severable from the Act. While the Court finds that the one-house veto provision is severable from the Act, see IV B, *infra*, this finding does not save the regulations which were thrice revised by virtue of the exercise of that unconstitutional provision.

As the Court has previously mentioned in its discussion of retroactivity, GSA has admitted in *Nixon v. Solomon, supra,* that the different sets of regulations had been influenced by Congress and that the fourth set of regulations were "in part or in whole" the product of the exercise of the one-house veto. Defendants have in this case admitted that Congress had an in-put into the modification of the regulations. *See* Defendants' Responses to Plaintiffs' First Set of Requests for Admission, numbers 6, 8, and 13. As in *Chadha*, the actions of the House and the Senate regarding the public access regulations had the "purpose and effect of altering legal rights, duties and relations of persons, . . . all outside the legislative branch." *Chadha*, 103 S.Ct. at 2784. In the absence of the repeated exercise of the legislative veto, the regulations would not have undergone the changes they did. Indeed, Congress clearly intended to retain complete control over the writing of the regulations. Congressman Brademus stated prior to passage,

> . . . it is precisely because we shared that apprehension that those regulations would not go into effect without an opportunity for both the House and Senate

to review the regulations and to exercise a veto if we disapprove of them.

See 120 Cong.Rec. 37903.

The repeated exercise of the one-house veto provision, which is apparent from the legislative record submitted by the parties, distinguishes this case from *EEOC v. Allstate Ins. Co.*, 570 F.Supp. 1224 (S.D.Miss. 1983). In that case, the District Court invalidated a statute which reorganized Executive Branch responsibilities because it contained a one-house veto provision, even though the one-house veto was never exercised. This case involves a continued and deliberate exercise of the power to redraft regulations in much the same way that legislation would be molded. The exercise of the veto has tainted all sets of regulations. Since the method by which they were modified is void, the by-product must as well be invalidated.

B. Severability of Section 104(b)

When one provision of a statute is declared invalid, a court must determine whether that provision is severable from the remainder of the statute. The Supreme Court has announced that "[u]nless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), *citing, Champlin Refining Co. v. Corporation Commission*, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062 (1932).

The Supreme Court has stated that where a statute contains a severability provision "[t]hat discusses an intention to make the Act divisible and creates a presumption that, eliminating invalid parts, the legislature would have been satisfied with what remained ..." *Champlin Refining Co. v. Corporation Commission*, 286 U.S. 210, 235, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932). The Supreme Court applied the same analysis in *Electric Bond and Share Co. v. SEC*, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936 (1938) when it was asked to review a challenge to an injunction entered pursuant to two sections of the Public Utility Holding Act of 1935, 49 Stat. 803. One section of that Act required holding companies to file a detailed registration statement; pursuant to the other section, holding companies that failed to register were prohibited from using the mails and instrumentalities of interstate commerce. In that case, petitioners had argued to the Court that these two sections were "purely auxiliary" to other "control" provisions of the Act the intent of which was to simplify and eliminate holding company systems; they therefore urged that the entire Act be invalidated. The Supreme Court found that Congress had expressed its intent regarding separability by including such a provision of the Act. It explained,

> Congress has thus said that the statute is not an integrated whole, which as such must be sustained or held invalid. On the contrary, when validity is in question, divisibility and integration is the guiding principle. Invalid parts are to be excised and the remainder enforced. When we are seeking to ascertain the congressional purpose, we must give heed to this explicit declaration.

*Id.* at 434, 58 S.Ct. at 683. Furthermore, the Court found that "invalidity should not extend to the remaining parts if by reason of their nature and as a practical matter they could be separately sustained and enforced." *Id.* at 439, 58 S.Ct. at 685. Reasoning that Sections 4 and 5 would serve a purpose independently of other provisions in the Act and that they could be enforced, the Court sustained the injunction entered by the District Court and reserved a decision on the validity of the remaining provisions which had not yet been challenged.

In *Chadha*, the Supreme Court found that it need not "embark on the elusive inquiry" set forth in *Buckley v. Valeo* since there was a severability provision in the Immigration and Nationality Act. *Chadha*, 103 S.Ct. at 2774. Nevertheless, it did consider the legislative history and concluded that, "[a]lthough it may be that Congress was reluctant to delegate final authority over cancellation of deportations,

such reluctance is not sufficient to overcome the presumption of severability raised by § 406." *Id.* at 2774.

The District of Columbia Circuit has recognized that the presence of a severability provision, "makes it extremely difficult for a party to demonstrate inseverability." *Consumer Energy Council of America v. FERC,* 673 F.2d 425 (D.C.Cir.1982), *aff'd sub nom. Process Gas Consumers Group v. Consumer Energy Council of America,* — U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983). Although the Court found that using presumptions would not help resolve the issue, 673 F.2d at 442, that distinction would not have been helpful in any event since it was analyzing a statute which contained no severability clause. Despite the presence of a severability clause, this Circuit in *American Federation of Government Employees v. Pierce,* 697 F.2d 303 (D.C.Cir.1982) refused to sever an invalid clause to leave the valid portion in effect. There the Court considered whether a provision that conditioned the disbursement of HUD funds was severable from a clause which required the approval of the Committee on Appropriation. The Court held that the clause requiring prior approval was invalid. Pursuant to *Buckley* and *Champlin* the Court considered whether Congress intended that which remained, the prevention of the disbursement of funds. Since it found that Congress did not intend to prevent the unconditional disbursement of funds, it struck that clause as well.

The Act in issue here contains a severability clause. It provides, in pertinent part,

If, ..., a judicial decision is rendered that a particular provision of this title or a particular regulation issued under the authority granted by this title, is unconstitutional or otherwise invalid, such decision shall not affect in any way the validity or enforcement of any other provision of this title or any regulation issued under the authority granted by this title.

The Act at § 105(b). A severability provision creates a presumption that Congress would have been satisfied with those sections which remain after the invalidated ones are dropped. The Court does not rely solely on the presence of this clause in finding the invalid section severable, however. Plaintiffs assert that the entire Section 104 must be invalidated. This would gut the statute. The Court has examined the legislative history of the Act, as a whole, and the legislative history of the veto provision itself. The Court recognizes that both contain heated statements by various members of both Houses of Congress concerning whether they should trust the agency with control of the documents and how they might supervise the process leading to public access. Those intentions were subsequently realized when Congress exercised the veto it had authorized itself under the Act. The Court has also considered plaintiffs' argument that the one-house veto provision is quite detailed and demonstrates that Congress was preoccupied with exactly how it would exercise its power. The fact remains, however, that Congress was also concerned that a judicial decision, such as this one, which declares the one-house veto provision invalid, not drag the remainder of the statute down with it. The Court has not ignored the atmosphere in which the Act was created; rather, it concludes that emotional remarks exchanged by Congressmen in creating emergency legislation cannot compel it to invalidate the remainder of the section which allows the Administrator to promulgate regulations, taking into account certain enumerated considerations. The Court has decided that Section 104(b) in its entirety is unconstitutional and that because of the legislative history and the repeated exercise of the one-house veto the present regulations promulgated thereunder are invalid.

Although the issue of severability was not before the three judge district Court in *Nixon v. Administrator,* with Dickensonian prescience of things yet to come, Judge McGowan anticipated the severability question now before this Court. He wrote,

For if a reviewing court were to hold that a set of regulations, whose content

was due in part to exercise of the power to disapprove delegated to a single House of Congress, were constitutionally defective, the Administrator at that point would presumably be free to draft regulations more protective of constitutional rights, ignoring any activity of a single House if a court had already found such activity to render regulations unconstitutional.

*Nixon v. Administrator*, 408 F.Supp. at 338 n. 17. His comments highlight the desirability of saving the provision and leaving a workable statute. Section 104(a) still provides a viable framework for the Administrator to promulgate new regulations.

In determining severability, the Supreme Court has instructed that, "a provision is further presumed severable if what remains after severance is fully operative as a law." *Chadha, supra,* 103 S.Ct. at 2775, *quoting, Champlin Refining Co.,* 286 U.S. at 234, 52 S.Ct. at 565. Once the one-house veto provision is struck from the Act, and with it all of the past sets of regulations, the rule-making authority of the Administrator under Section 104(a) remains. In reaching this conclusion, the Court disagrees with defendants that sections 104(b)(1) and (3) would remain. Those sections respectively provide that the regulations shall take effect within ninety legislative days and that changes in the regulations proposed by the Administrator shall be subject to the same provisions. Section 104(a), standing alone, is comparable in design and effect to Section 244(c)(1) of the Immigration and Nationality Act left remaining after the Supreme Court invalidated the one-house veto provision in *Chadha.* See *Chadha,* 103 S.Ct. at 2775–76. Under the Act, as here, a report will continue to be made to Congress. As such it will resemble the "report and wait" provision discussed in *Chadha, supra* at 2777 n. 9. Pursuant to this decision, the Administrator will have to promulgate appropriate new public access regulations by normal procedures which will become effective absent intervening corrective legislation.

The Court has found that *Chadha* should be applied retroactively to invalidate Section 104(b) of the Act and the regulations promulgated thereunder but that the rulemaking authority delegated to the Administrator under Section 104(a) is an independent, fully operative, valid provision intended to be severable from Section 104(b). A necessary ingredient to this decision has been the factor of Congressional influence, which defendants have conceded and which the Court has seen and referred to throughout this opinion. The Court will not address this as a separate ground on which plaintiffs also seek judgment for it would not militate a different result; furthermore, a consideration of this alternative basis is not necessary in light of the Court's decision.

Often Courts are asked to decide cases that are significant only to the parties before it. Since it only writes an opinion for an audience that is all too familiar with the history of the case and the legal principles involved, it can phrase its opinion accordingly. This is not such a case and for this reason the Court wishes to caveat its decision. The decision rendered herein will not mean that the public will be foreclosed indefinitely or permanently from access to the materials authored by these plaintiffs. It will only mean that the access will be delayed as it has been in the past. Its decision is aimed at the process of providing for access not at the result of access itself. The public should learn about the Watergate era; the process should not create further unfairness. This Court has today held invalid much work. The risk that what was well intended will one day be undone faces all branches of government, including district courts. While it has invalidated the regulations thereby delaying the fruit of several years of work, it has also found that much may be preserved.

If the Administrator or Congress works swiftly, then appropriately promulgated regulations may become effective in the relatively near future assuring public ac-

cess to the materials with due regard to individual rights.

An appropriate order accompanies this Opinion.

## APPENDIX I

### RULES AND REGULATIONS

63626

**[ 6820–26 ]**

**Title 41—Public Contracts and Property Management**

**CHAPTER 105—GENERAL SERVICES ADMINISTRATION**

**PART 105–63—PRESERVATION OF AND PROTECTION OF AND ACCESS TO THE PRESIDENTIAL HISTORICAL MATERIALS OF THE NIXON ADMINISTRATION**

**Public Access Regulations**

AGENCY: General Services Administration.

ACTION: Final rule.

SUMMARY: This rule provides procedures for preserving and protecting the Presidential historical materials of the Nixon administration and for providing access to these materials. The Administrator of General Services is required by law to issue these regulations.

EFFECTIVE DATE: December 16, 1977.

FOR FURTHER INFORMATION CONTACT:

Steven Garfinkel, Chief Counsel for Records and Archives, General Services Administration, 18th and F Streets NW., Washington, D.C. 20405, 202–566–1460.

SUPPLEMENTARY INFORMATION: On June 2, 1977, the Administrator of General Services submitted to the Congress proposed regulations implementing Section 104 of the Presidential Recordings and Materials Preservation Act (Pub. L. 93–526; 88 Stat. 1695; 44 U.S.C. 2107 note). Subsection 104(a) of the Act provides, "The Administrator shall • • • submit to each House of Congress a report proposing and explaining regulations that would provide public access to the tape recordings and other (Presidential historical) materials (of the Nixon Administration)." Subsection 104(b)(1) of the Act provides, "The regulations proposed by the Administrator • • • shall take effect upon the expiration of 90 legislative days • • • unless such regulations are disapproved by a resolution adopted by either House of the Congress during such period." On December 12, 1977, the proposed regulations had lain before the Congress for 90 legislative days, neither House of Congress having passed a regulation disapproving the proposed regulations. Accordingly, the General Services Administration now publishes and puts` in effect the regulations proposed to the Congress on June 2, 1977.

The table of contents for Part 105–63 is amended by the addition of the following new entries:

Sec.
105–63.104 Definitions.

Subpart 105–63.4—Access by the Public
105–63.400 Scope of subpart.
105–63.401 Processing period; notice of proposed opening.
105–63.401–1 Rights and privileges; right to a fair trial.
105–63.401–2 Segregation and review; Senior Archival Panel; Presidential Materials Review Board.
105–63.401–3 Notice of determination to transfer materials.
105–63.401–4 Appeals.
105–63.401–5 Transfer of materials.
105–63.402 Restrictions.
105–63.402–1 Materials related to abuses of governmental power.
105–63.402–2 Materials of general historical significance unrelated to abuses of governmental power.
105–63.402–3 Periodic review of restrictions.
105–63.402–4 Appeal of restrictions.
105–63.402–5 Deletion of restricted portions.
105–63.402–6 Requests for declassification.
105–63.403 Reference room locations, hours, and rules.
105–63.404 Reproduction of tape recordings of Presidential conversations.
105–63.405 Reproduction and authentication of other materials.
105–63.406 Amendment of regulations.

AUTHORITY: Sec. 205(c), 63 Stat. 390 (40 U.S.C. 496(c)); secs. 103 and 104 of Pub. L. 93–526; 88 Stat. 1695 (44 U.S.C. 2107 note).

**Subpart 105–63.1—General Provisions**

Section 105–63.104 is added to read as follows:

**§ 105–63.104 Definitions.**

For the purposes of this Part 105–63, the following terms have the meaning ascribed to them in this § 105–63.104.

(a) *Presidential historical materials.* The term "Presidential historical materials" (also referred to as "historical materials" and "materials") shall mean all papers, correspondence, documents, pamphlets, books, photographs, films, motion pictures, sound and video recordings, machine-readable media, plats, maps, models, pictures, works of art, and other objects or materials made or received by former President Richard M. Nixon or by members of his staff in connection with his constitutional or statutory duties or political activities as President and retained or appropriate for retention as evidence of or information about these duties and activities. Excluded from this definition are documentary materials of any type that are determined to be the official records of an agency of the Government; private or personal materials; stocks of publications, processed documents, and stationery; and extra copies of documents produced only for convenience of reference, when they are clearly so identified.

(b) *Private or personal materials.* The term "private or personal materials" shall mean those papers and other documentary or commemorative materials in any physical form relating solely to a person's family or other nonpublic activities, and having no connection with his constitutional or statutory duties or political activities as President or as a member of the President's staff.

(c) *Abuses of governmental power popularly identified under the generic term "Watergate".* The term "abuses of governmental power popularly identified under the generic term 'Watergate'" (also referred to as "abuses of governmental power"), shall mean those alleged acts, whether or not corroborated by judicial, administrative or legislative proceedings, which allegedly were conducted, directed, or approved by Richard M. Nixon, his staff or persons associated with him in his constitutional, statutory or political functions as President, and (1) are or were within the purview of the charters of the Senate Select Committee on Presidential Campaign Activities or the Watergate Special Prosecution Force; or (2) are circumscribed in the Articles of Impeachment adopted by the House Committee on the Judiciary and reported to the House of Representatives for consideration in House Report No. 93–1305.

(d) *General historical significance.* The term "general historical significance" shall mean having administrative, legal, research or other historical value as evidence of or information about the constitutional or statutory duties or political activities of the President, which an archivist has determined is of quality sufficient to warrant the retention by the United States of materials so designated.

(e) *Archivist.* The term "archivist" shall mean an employee of the General Services Administration who, by education or experience, is specially trained in archival science.

(f) *Agency.* The term "agency" shall mean an executive department, military department, independent regulatory or nonregulatory agency, Government corporation, Government-controlled corporation, or other establishment in the executive branch of the Government, including the Executive Office of the President. For purposes of § 105–63.302 only, the term "agency" shall also include the White House Office.

(g) *Administrator.* The term "Administrator" shall mean the Administrator of General Services, or his delegate as provided herein or by separate instrument.

(h) *Initial archival processing.* The term "initial archival processing" shall mean the following generic acts performed by archivists with respect to the Presidential historical materials: Shelving boxes of documents in chronological, alphabetical, numerical or other sequence; surveying and developing a location register and cross-index of the boxes;. arranging materials; reboxing the documents and affixing labels; producing finding aids such as folder title lists, cross-indexes, and subject lists; reproducing and transcribing tape recordings; reviewing the materials to identify items that appear subject to restriction; identifying items in poor physical condition and assuring their preservation; and identifying materials requiring further processing. .

(i) *Staff.* The term "staff" shall mean those persons whose salaries were paid fully or partially from appropriations to the White House Office or Domestic Council, or who were detailed on a non-

reimbursable basis to the White House Office or Domestic Council from any other Federal activity; or those persons who were otherwise designated as assistants to the President, in connection with their service in that capacity; or any other persons whose files were sent to the White House Central Files Unit or Special Files Unit, for purposes of those files.

(j) *National security classified information.* The term "national security classified information" shall mean any matter which is security classified under existing law, and has been or should be designated as such.

Subpart 105–63.4 is added to read as follows:

**Subpart 105–63.4—Access by the Public**

**§ 105–63.400 Scope of subpart.**

This subpart sets forth policies and procedures concerning public access to the Presidential historical materials of Richard M. Nixon.

**§ 105–63.401 Processing period; notice of proposed opening.**

(a) For 30 calendar days following the effective date of the regulations in this subpart, or the vacation of court orders preventing their implementation, whichever is later (hereinafter the "effective date") the Administrator will refrain from archival processing of any of the Presidential historical materials in the Administrator's custody and control to permit any person to take such action as he deems appropriate to protect his legal rights. During this 30-day period, the Administrator will limit activity involving the materials to authorized accesses under Subpart 105–63.3 of this part.

(b) At the end of the 30-day period described in paragraph (a) of this section, the Administrator will commence the initial archival processing of the materials. As soon thereafter as possible, the Administrator will open for public access all of the materials in the Administrator's custody and control which are neither restricted pursuant to § 105–63.402 nor subject to outstanding claims or petitions seeking such restriction. The Administrator will open for public access each integral file segment of the materials upon completion of initial archival processing on that segment. Insofar as practicable, the Administrator will give priority in such initial archival processing to materials relating to abuses of governmental power as defined in § 105–63.104(c).

(c) At least 30 calendar days prior to the opening to public access of any integral file segment of the materials, the Administrator will publish notice in the FEDERAL REGISTER of the proposed opening. The notice will reasonably identify the material to be opened and will include a reference to the right of any interested person to file a claim or petition in accordance with § 105–63.401–1. Copies of the notice will be sent by certified mail to the last known address of: Mr.

Nixon, or his designated agent or heirs; any former staff member reasonably identifiable as the individual responsible for creating or maintaining the file segment proposed to be opened; and any individual named in material which the Administrator may not restrict in accordance with § 105–63.402–1(b) because the material is essential to an understanding of an abuse of governmental power.

**§ 105–63.401–1 Rights and privileges; right to a fair trial.**

(a) Within 30 days following publication of the notice prescribed in § 105–63.401(c), any person claiming the need to protect an opportunity to assert a legal or constitutional right or privilege which would prevent or limit public access to any of the materials shall notify the Administrator in writing of the claimed right or privilege and the specific materials to which it relates. After consultation with appropriate Federal agencies, the Administrator will notify the claimant by certified mail, return receipt requested, of his decision regarding public access to the pertinent materials. If that decision is adverse to the claimant, the Administrator will refrain from providing public access to the pertinent materials for at least 30 calendar days from receipt by the claimant of such notice.

(b) Within 30 days following publication of the notice prescribed in § 105–63.401(c), officers of any Federal, State, or local court and other persons who believe that public access to any of the materials may jeopardize an individual's right to a fair and impartial trial should petition the Administrator; setting forth the relevant circumstances that warrant withholding specified materials. After consultation with appropriate Federal agencies, the Administrator will notify the petitioner by certified mail, return receipt requested, of his decision regarding public access to the pertinent materials. If that decision is adverse to the petitioner, the Administrator will refrain from providing public access to the pertinent materials for at least 30 calendar days from receipt by the petitioner of such notice.

**§ 105–63.401–2 Segregation and review; Senior Archival Panel; Presidential Materials Review Board.**

(a) During the processing period described in § 105–63.401(b), the Administrator will assign archivists to segregate private or personal materials, as defined in § 105–63.104(b). The archivists shall have sole responsibility for the initial review and determination of private or personal materials.

(b) During the processing period described in § 105–63.401(b), the Administrator will assign archivists to segregate materials neither relating to abuses of governmental power, as defined in § 105–63.104(c), nor otherwise having general historical significance, as defined in § 105–63.104(d). The archivists shall have sole responsibility for the initial review

and determination of those materials which are not related to abuses of governmental power and do not otherwise have general historical significance.

(c) During the processing period described in § 105–63.401(b), the Administrator will assign archivists to segregate materials subject to restriction, as prescribed in § 105–63.402. The archivists shall have sole responsibility for the initial review and determination of materials that should be restricted. The archivists shall insert a notification of withdrawal at the front of the file folder or container affected by the removal of restricted material. The notification shall include a brief description of the restricted material and the basis for the restriction as prescribed in § 105–63.402.

(d) If, during the processing period described in § 105–63.401(b), the archivists should discover materials which reflect an apparent violation of law, the archivists shall bring the materials to the attention of the Administrator for referral to the Department of Justice or any other appropriate agency of the United States which has responsibility for investigating a violation of law.

(e) If the archivists are unable to make a determination required in paragraphs (a), (b), or (c) of this subsection, or if the archivists conclude that the required determination raises significant issues involving interpretation of these regulations or will have far-reaching precedential value, the archivists shall submit the pertinent materials, or representative examples of them, to a panel of senior archivists selected by the Archivist of the United States. The Panel shall then have the sole responsibility for the initial determination required in paragraphs (a), (b), or (c) of this subsection.

(f) If the Senior Archival Panel is unable to make a determination required in paragraph (e) of this subsection, or if the panel concludes that the required determination raises significant issues involving interpretation of these regulations or will have far-reaching precedential value, the Panel shall certify the matter and submit the pertinent materials, or representative examples of them, to the Presidential Materials Review Board.

(g) The Presidential Materials Review Board ("Board") shall consist of the Administrator of General Services, who shall serve as Chairman, and the following members:

(1) The Archivist of the United States;

(2) The Librarian of Congress;

(3) An official of the Department of Justice, nominated by the Attorney General; and

(4) A person, distinguished in archival science, history or political science, who shall not be a Federal employee or official, nominated by the Council of the Society of American Archivists.

The Board shall meet at the call of the Chairman. Three members of the Board shall constitute a quorum for the conduct of the Board's business, al-

though each member of the Board may participate in all of the Board's decisions. Members of the Board may be represented by their delegates on those occasions when they are unable to attend the meetings of the Board. The Board may consult with officials of interested Federal agencies in formulating its decisions.

(h) When the matter certified to the Board by the Senior Archival Panel involves a determination required in paragraphs (a) or (b) of this subsection, the Administrator will publish notice in the FEDERAL REGISTER of the materials to be considered by the Board. In order to protect the privacy of persons who may have such an interest in the materials, the notice shall consist only of a generic description and listing of the materials to be considered by the Board. Any person may intervene in the Board's consideration by petitioning the Administrator in writing within 30 calendar days of publication of notice. The Board shall prepare a final written decision, together with dissenting and concurring opinions, of the proper categorization and disposition of the pertinent materials. The Board's decision will be the final administrative determination. The Administrator will notify the petitioner by certified mail, return receipt requested, of the final administrative determination within 60 calendar days following receipt of such petition. The Administrator will refrain from transferring any materials in accordance with § 105–63.401–5(a) as a result of the final administrative determination for at least 30 calendar days from the petitioner's receipt of such notice.

(i) When the matter certified to the Board by the Senior Archival Panel involves a determination required in paragraph (c) of this subsection, the Board shall recommend an initial determination to the Senior Archival Panel, which shall retain the sole responsibility for the initial determination.

§ 105–63.401–3 Notice of determination to transfer materials.

The Administrator will publish in the FEDERAL REGISTER notice of determinations to transfer material, whether as a result of the initial archival determinations described in paragraphs (a) and (b) of § 105–63.401–2 or of the final administrative determinations described in paragraph (h) of § 105–63.401–2. In order to protect the privacy of persons who may have an interest in the segregated materials, the notice shall consist only of a generic description and listing of the materials that the Administrator proposes to transfer as provided in § 105–63.401–5.

§ 105.63.401–4 Appeals.

(a) Within 30 calendar days of publication of the notice prescribed in § 105–63.401–3, any person may petition the Administrator on the grounds that an initial archival determination described in § 105–63.401–2 (a) or (b) is in error.

(b) Richard M. Nixon, or his designated agent or heirs, may petition the Administrator at any time on the grounds that an initial archival determination described in § 105–63.401–2 (a) or (b) is in error.

(c) Upon receipt by the Administrator of a petition described in paragraphs (a) or (b) of this subsection, the archivists shall submit the pertinent materials, or representative examples of them, to the Presidential Materials Review Board.

(d) Upon consideration of appeals as described in paragraphs (a) or (b) of this subsection, the Board shall prepare a final written decision, together with dissenting and concurring opinions, of the proper categorization and disposition of the pertinent materials. The Board's decision will be the final administrative determination. The Administrator will notify the petitioner by certified mail, return receipt requested, of the final administrative determination within 60 calendar days following receipt of such petition. The Administrator will refrain from transferring any materials in accordance with § 105–63.401–5(a) as a result of the final administrative determination for at least 30 calendar days from the petitioner's receipt of such notice.

§ 105–63.401–5 Transfer of materials.

(a) No sooner than 30 calendar days from the publication of notice prescribed in § 105–63.401–3, or, in the event of a certified determination or an appeal described in § 105–63.401–2(h) or § 105–63.401–4, respectively, no sooner than 30 calendar days from the petitioner's receipt of notice of the final administrative determination, the Administrator will transfer sole custody and use of those materials determined, in whole, to be private or personal, or to be neither related to abuses of governmental power nor otherwise of general historical significance, to former President Nixon or his heirs or, when appropriate and after notifying Mr. Nixon or his designated agent, to the former staff member having primary proprietary or commemorative interest in the materials.

(b) Materials determined to be neither related to abuses of governmental power nor otherwise of general historical significance, and transferred pursuant to paragraph (a) of this subsection, shall upon such transfer no longer be deemed Presidential historical materials as defined in § 105–63.104(a).

(c) When it has been determined that only a segment or portion of a document, recording, or other material is private or personal, or is neither related to abuses of governmental power nor otherwise of general historical significance, the Administrator will retain custody of the whole recording, document, or other material, but will restrict access to the identified segment or portion. Copies of the pertinent materials will be transferred to former President Nixon or his heirs or, when appropriate and after notifying Mr. Nixon or his designated agent, to the former staff member having primary proprietary or commemorative interest in the materials.

§ 105–63.402 Restrictions.

§ 105–63.402–1 Materials related to abuses of governmental power.

(a) The Administrator will restrict access to materials determined during the processing period to relate to abuses of governmental power, as defined in § 105–63.104(c), when:

(1) The Administrator, in accordance with § 105–63.401–1, is in the process of reviewing or has determined the validity of a claim by any person of the need to protect an opportunity to assert a legal or constitutional right or privilege; or

(2) The Administrator, in accordance with § 105–63.401–1, is in the process of reviewing or has determined the validity of a petition by any person of the need to protect an individual's right to a fair and impartial trial; or

(3) The release of the materials would violate a Federal statute; or

(4) The materials are authorized under criteria established by Executive order to be kept secret in the interest of national defense or foreign policy, provided that any question as to whether materials are in fact properly classified or are properly subject to classification shall be resolved in accordance with the applicable Executive order or as otherwise provided by law. However, the Administrator may waive this restriction when:

(i) (A) The requester is engaged in an historical research project; or (B) the requester is a former Federal official who had been appointed by the President to a policymaking position and who seeks access only to those classified materials which he originated, reviewed, signed or received while in public office; and

(ii) The requester has a security clearance equivalent to the highest degree of national security classification that may be applicable to any of the materials to be examined; and

(iii) The Administrator has determined that the heads of agencies having subject mater interest in the material do not object to the granting of access to the materials; and

(iv) The requester has signed a statement, which declares that the requester will not publish, disclose, or otherwise compromise the classified material to be examined and that the requester has been made aware of Federal criminal statutes which prohibit the compromise or disclosure of this information.

(b) The Administrator will restrict access to any portion of materials determined to relate to abuses of governmental power when the release of those portions would constitute a clearly unwarranted invasion of personal privacy or constitute libel of a living person: Provided, That if material related to an abuse of governmental power refers to, involves or incorporates such personal information, the Administrator will make available such personal information, or portions thereof, if such personal information, or portions thereof, is essential to an understanding of the abuses of governmental power.

**§ 105–63.402–2 Materials of general historical significance unrelated to abuses of governmental power.**

(a) The Administrator will restrict access to materials determined during the processing period to be of general historical significance, but not related to abuses of governmental power, under one or more of the circumstances specified in § 105–63.402–1(a).

(b) The Administrator will restrict access to materials of general historical significance, but not related to abuses of governmental power, when the release of these materials would:

(1) Disclose trade secrets and commercial or financial information obtained from a person and privileged or confidential; or

(2) Constitute a clearly unwarranted invasion of personal privacy or constitute libel of a living person; or

(3) Disclose investigatory materials compiled for law enforcement purposes, but only when the disclosure of such records would:

(i) Interfere with enforcement proceedings;

(ii) Deprive a person of a right to a fair trial or an impartial adjudicaton;

(iii) Constitute an unwarranted invasion of personal privacy;

(iv) Disclose the identity of a confidential source, and in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source;

(v) Disclose investigative techniques and procedures, or;

(vi) Endanger the life or physical safety of law enforcement personnel.

**§ 105–63.402–3 Periodic review of restrictions.**

The Administrator periodically will assign archivists to review materials placed under restriction by § 105–63.402 and to make available for public access those materials which, with the passage of time or other circumstances, no longer require restriction. If the archivists are unable to determine whether certain materials should remain restricted, the archivists shall submit the pertinent materials, or representative examples of them, to the Senior Archival Panel described in § 105–63.401–2(e), which shall then have the responsibility for determining if the materials should remain restricted. The Senior Archival Panel may seek the recommendations of the Presidential Materials Review Board, in the manner prescribed in paragraphs (f) and (i) of § 105–63.401–2, in making its determination.

**§ 105–63.402–4 Appeal of restrictions.**

Upon petition of any researcher who claims in writing to the Administrator that the restriction of specified materials is inappropriate and should be removed, the archivists shall submit the pertinent materials, or representative examples of them, to the Presidential Materials Review Board described in § 105–63.401–2 (g). The Board shall review the restricted materials, and consult with interested Federal agencies as necessary. The Board shall prepare a final written decision, including dissenting and concurring opinions, as to the continued restriction of all or part of the pertinent materials. The Board's decision shall be the final administrative determination. The Administrator will notify the petitioner of the final administrative determination within 60 calendar days following receipt of such petition.

**§ 105–63.402–5 Deletion of restricted portions.**

The Administrator will provide a requester any reasonably segregable portions of otherwise restricted materials after the deletion of the portions which are restricted under this § 105–63.402.

**§ 105–63.402–6 Requests for declassification.**

Challenges to the classification and requests for the declassification of national security classified materials shall be governed by the provisions of § 105–61.104, as that may be amended from time to time.

**§ 105–63.403 Reference room locations, hours, and rules.**

The Administrator shall, from time to time, separately prescribe the precise location or locations where the materials shall be available for public reference, and the hours of operation and rules governing the conduct of researchers using such facilities. This information may be obtained by writing to: Office of tional Archives, Washington, D.C. 20408, Presidential Libraries (NL), The National Archives, Washington, D.C. 20408.

**§ 105–63.404 Reproduction of tape recordings of Presidential conversations.**

(a) To ensure the preservation of original tape recordings of conversations which were recorded or caused to be recorded by any officer or employee of the Federal Government and which;

(1) Involve former President Richard M. Nixon or other individuals who, at the time of the conversation, were employed by the Federal Government; and

(2) Were recorded in the White House or in the office of the President in the Executive Office Buildings located in Washington, District of Columbia; Camp David, Md.; Key Biscayne, Fla.; or San Clemente, Calif.; and

(3) Were recorded during the period beginning January 20, 1969, and ending August 9, 1974,

the Administrator will produce duplicate copies of such tape recordings in his custody for public and official reference use. The original tape recordings shall not be available for public access.

(b) Since the original tape recordings may contain information which is subject to restriction in accordance with § 105–63.402, the archivists shall review the tapes and delete restricted portions from copies for public and official reference use.

(c) Researchers may listen to reference copies of the tape recordings described in paragraph (a) in the National Archives Building in Washington, D.C. and at other reference locations established by the Administrator in accordance with § 105–63.403. Researchers may obtain copies of the reference tapes only in accordance with procedures comparable to those approved by the United States District Court for the District of Columbia in *United States* v. *Mitchell et al.; In re National Broadcasting Company, Inc., et al.*, D.C. Miscellaneous 74–128.

**§ 105–63.405 Reproduction and authentication of other materials.**

(a) The copying for researchers of materials other than tape recordings described in § 105–63.404 normally will be done by personnel of the General Services Administration using government equipment. With the permission of the Administrator or his designated agent, a researcher may use his own copying equipment. Permission shall be based on the determination that such use will not harm the materials or disrupt reference activities. Equipment shall be used under the supervision of GSA personnel.

(b) The Administrator may authenticate and attest copies of materials when necessary for the purpose of the research.

(c) The fees for reproduction and authentication of materials under this section shall be those prescribed in the schedule set forth in Subpart 105–61.52, or pertinent successor regulation, as that schedule is amended from time to time.

**§ 105–63.406 Amendment of regulations.**

The Administrator may amend the regulations of this Subpart 105–63.4 only after the proposed amendments have been placed before the Congress for 90 legislative days. Proposed amendments shall become effective upon the expiration of this period, unless the proposed amendments are disapproved by a resolution adopted by either House of Congress during such period.

NOTE.—The General Services Administration has determined that this document does not contain a major proposal requiring preparation of an Inflation Impact Statement under Executive Order 11821 and OMB Circular A–107.

JOEL W. SOLOMON,
*Administrator
of General Services.*

[FR Doc.77–36167 Filed 12–15–77;11:12 am]

APPENDIX II

Administrator of General Services is required by law to issue these regulations.

**EFFECTIVE DATE:** March 7, 1980.

**FOR FURTHER INFORMATION CONTACT:** Steven Garfinkel, Chief Counsel for Records and Archives, General Services Administration, 18th and F Streets, N.W., Washington, DC 20405. 202-566-1460.

**SUPPLEMENTARY INFORMATION:**

On December 16, 1977, the Administrator published in the **Federal Register** (42 FR 63626) public access regulations implementing Section 104 of the Presidential Recordings and Materials Preservation Act (Pub. L. 93-526; 88 Stat. 1695; 44 U.S.C. 2107 note). Subsequently, the constitutionality of certain of these regulations was challenged in the United States District Court for the District of Columbia *(Nixon v. Solomon,* Civil Action No. 77-1395). Except for those issues which remain in litigation, these amended regulations reflect an agreement reached by the parties in that litigation and accepted by the court as a partial settlement of the lawsuit. Also, in accordance with Subsection 104(b)(3) of the Act, these amended regulations have lain before the Congress for 90 legislative days, neither House of Congress having adopted a resolution disapproving any of these amendments. Because the proposed amendments represent an agreement reached by parties in litigation, and because they were available for public review and comment while they lay before the Congress, the General Counsel of GSA has determined that they may be published as effective without an additional waiting period of 60 days for public comment, as provided in E.O. 12044 of March 23, 1978.

1. The table of contents for Part 105-63 is amended by adding one entry, as follows.

Sec.
105-63.407 Freedom of Information requests.

**Subpart 105-63.1—General Provisions**

2. Section 105-63.104 is revised to read as follows:

**§ 105-63.104 Definitions.**

For the purposes of this Part 105-63, the following terms have the meaning ascribed to them in this § 105-63.104.

(a) *Presidential historical materials.* The term "Presidential historical materials" (also referred to as "historical materials" and "materials") shall mean all papers, correspondence, documents, pamphlets, books, photographs, films, motion pictures, sound and video recordings, machine-readable media, plats, maps, models, pictures, works of art, and other objects or materials made or received by former President Richard M. Nixon or by members of his staff in connection with his constitutional or statutory powers or duties as President and retained or appropriate for retention as evidence of or information about these powers or duties. Included in this definition are materials relating to the political activities of former President Nixon or members of his staff, but only when those activities directly relate to or have a direct effect upon the carrying out of constitutional or statutory powers or duties. Excluded from this definition are documentary materials of any type that are determined to be the official records of an agency of the Government; private or personal materials; stocks of publications, processed documents, and stationery; and extra copies of documents produced only for convenience of reference, when they are clearly so identified.

(b) *Private or personal materials.* The term "private or personal materials" shall mean those papers and other documentary or commemorative materials in any physical form relating solely to a person's family or other non-governmental activities, including private political associations, and having no connection with his constitutional or statutory powers or duties as President or as a member of the President's staff.

(c) *Abuses of governmental power popularly identified under the generic term "Watergate".* The term "abuses of governmental power popularly identified under the generic term 'Watergate' " (also referred to as "abuses of governmental power"), shall mean those alleged acts, whether or not corroborated by judicial, administrative or legislative proceedings, which allegedly were conducted, directed or approved by Richard M. Nixon, his staff or persons associated with him in his constitutional or statutory functions as President, or as political activities directly relating to or having a direct effect upon those functions, and which (1) were within the purview of the charters of the Senate Select Committee on Presidential Campaign Activities or the Watergate Special Prosecution Force; or (2) are circumscribed in the Articles of Impeachment adopted by the House Committee on the Judiciary and reported to the House of Representatives for consideration in House Report No. 93-1305.

(d) *General historical significance.* The term "general historical significance" shall mean having administrative, legal, research or other historical value as evidence of or information about the constitutional or statutory powers or duties of the President, which an archivist has determined is of a quality sufficient to warrant the retention by the United States of materials so designated.

(e) *Archivist.* The term "archivist" shall mean an employee of the General Services Administration who, by education or experience, is specially trained in archival science.

(f) *Agency.* The term "agency" shall mean an executive department, military department, independent regulatory or nonregulatory agency, Government corporation, Government-controlled corporation, or other establishment in the exeuctive branch of the Government, including the Executive Office of the President. For purposes of § 105-63.302 only, the term "agency" shall also include the White House Office.

(g) *Administrator.* The term "Administrator" shall mean the Administrator of the General Services, or his delegate as provided herein or by separate instrument.

(h) *Initial archival processing.* The term "initial archival processing" shall mean the following generic acts performed by archivist with respect to the Presidential historical materials: Shelving boxes of documents in chronological, alphabetical, numerical or other sequence; surveying and developing a location register and cross-index of the boxes; arranging materials; reboxing the documents and affixing labels; producing finding aids such as folder title lists, cross-indexes, and subject lists; reproducing and transcribing tape recordings; reviewing the materials to identify items that appear subject to restriction; identifying items in poor physical condition and assuring their preservation; and identifying materials requiring further processing.

(i) *Staff.* The term "staff" shall mean those persons whose salaries were paid fully or partially from appropriations to the White House Office or Domestic Council, or who were detailed on a nonreimbursable basis to the White House Office or Domestic Council from any other Federal activity; or those persons who were otherwise designated as assistants to the President, in connection with their service in that capacity; or any persons whose files were sent to the White House Central Files Unit or Special Files Unit, for purposes of those files.

(j) *National security classified information.* The term "national security classified information" shall mean any matter which is security classified under

existing law, and has been or should be designated as such.

3. Subpart 105–63.4 is revised to read as follows:

## Subpart 105–63.4—Access by the Public

### § 105–63.400 Scope of the subpart.

This subpart sets forth policies and procedures concerning public access to the Presidential historical materials of Richard M. Nixon.

### § 105–63.401 Processing period; notice of proposed opening.

(a) The Administrator will commence the initial archival processing of the materials. In processing the materials, the archivists will give priority to segregating private or personal materials and transferring them to their proprietary or commemorative owner in accordance with § 105–63.401–3, below. As soon thereafter as possible, the Administrator will open for public access all of the materials in the Administrator's custody and control which are neither restricted pursuant to § 105–63.402 nor subject to outstanding claims or petitions seeking such restriction. The Administrator will open for public access each integral file segment of the materials upon completion of initial archival processing on that segment. Insofar as practicable, the Administrator will give priority in such initial archival processing to materials relating to abuses of governmental power as defined in § 105–63.104(c).

(b) At least 30 calendar days prior to the opening to public access of any integral file segment of the materials, the Administrator will publish notice in the Federal Register of the proposed opening. The notice will reasonably identify the material to be opened and will include a reference to the right of any interested person to file a claim or petition in accordance with § 105–63.401–1. Copies of the notice will be sent to the incumbent President of the United States or his designated agent and by first-class mail to the last known address of: Mr. Nixon, or his designated agent or heirs; any former staff member reasonably identifiable as the individual responsible for creating or maintaining the file segment proposed to be opened; any individual named in material which the Administrator may not restrict in accordance with § 105–63.402–1(b) because the material is essential to an understanding of an abuse of governmental power; and any persons named in the materials who are registered with the General Services

Administration in accordance with § 105–63.401(c), below.

(c) The Administrator will maintain a registry which shall contain the names and mailing addresses of persons who wish to receive personal notice of the proposed opening of integral file segments of the materials when those segments contain references about them. To be included in the registry, a person must submit his/her name and mailing address to the General Services Administration (NLN), Washington, D.C. 20408. Both the envelope and letter should be prominently marked, "Nixon Materials Registry." By submitting his/her name for inclusion in the registry, a person agrees to reimburse the United States for the cost of first-class postage for each instance of personal notice received.

### § 105–63.401–1 Rights and privileges; right to a fair trial.

(a) Within 30 days following publication of the notice prescribed in § 105–63.401(b), any person claiming a legal or constitutional right or privilege which would prevent or limit public access to any of the materials shall notify the Administrator in writing of the claimed right or privilege and the specific materials to which it relates. Unless the claim states that particular materials are private or personal (see paragraph (d), below), the Administrator will notify the claimant by certified mail, return receipt requested, of his decision regarding public access to the pertinent materials. If that decision is adverse to the claimant, the Administrator will refrain from providing public access to the pertinent materials for at least 30 calendar days from receipt by the claimant of such notice.

(b) Within 30 days following publication of the notice prescribed in § 105–63.401(b), officers of any Federal, State, or local court and other persons who believe that public access to any of the materials may jeopardize an individual's right to a fair and impartial trial should petition the Administrator setting forth the relevant circumstances that warrant witholding specified materials. The Administrator will notify the petitioner by certified mail, return receipt requested, of his decision regarding public access to the pertinent materials. If that decision is adverse to the petitioner, the Administrator will refrain from providing public access to the pertinent materials for at least 30 calendar days from receipt by the petitioner of such notice.

(c) In reaching decisions required by paragraphs (a) and (b) of this subsection, the Administrator may

consult with other appropriate Federal agencies. If these consultations require the transfer of copies of the materials to Federal officials in agencies other than the General Services Administration, the Administrator will transfer these copies in accordance with the procedures prescribed in §§ 105–63.204 and 105–63.302.

(d) Within 30 days following publication of the notice prescribed in § 105–63.401(b), any person claiming that materials proposed for public access are in fact private or personal, as defined in § 105–63.104(b), and that he or she is the proprietary or commemorative owner of those materials shall notify the Administrator in writing. The claim shall describe the specific materials to which it refers, and the claimant's basis for concluding that these materials are private or personal. Upon receipt of such a claim, the Administrator will transmit it to the Presidential Materials Review Board for its consideration and determination in accordance with § 105–63.401–2(i). The Administrator will refrain from providing public access to the pertinent materials or from returning them to the claimant for at least 30 calendar days from receipt by the claimant or any intervening parties of the Board's determination.

### § 105–63.401–2 Segregation and review; Senior Archival Panel; Presidential Materials Review Board.

(a) During the processing period described in § 105–63.401(a), the Administrator will assign archivists to segregate private or personal materials, as defined in § 105–63.104(b). The archivists shall have sole responsibility for the initial review and determination of private or personal materials. At all times when the archivists or other authorized officials have access to the materials in accordance with these regulations, they shall take all reasonable steps to minimize the degree of intrusion into private or personal materials. Except as provided in these regulations, the archivists or other authorized officials shall not disclose to any person private or personal or otherwise restricted information learned as a result of their activities under these regulations.

(b) During the processing period described in § 105–63.401(a), the Administrator will assign archivists to segregate materials neither relating to abuses of governmental power, as defined in § 105–63.104(c), nor otherwise having general historical significance, as defined in § 105–63.104(d). The archivists shall have sole responsibility for the initial review and determination of those materials which are not related

to abuses of governmental power and do not otherwise have general historical significance.

(c) During the processing period described in § 105–63.401(a), the Administrator will assign archivists to segregate materials subject to restriction, as prescribed in § 105–63.402. The archivists shall have sole responsibility for the initial review and determination of materials that should be restricted. The archivists shall insert a notification of withdrawal at the front of the file folder or container affected by the removal of restricted material. The notification shall include a brief description of the restricted material and the basis for the restriction as prescribed in § 105–63.402.

(d) If the archivists are unable to make a determination required in paragraphs (a), (b), or (c) of this subsection, or if the archivists conclude that the required determination raises significant issues involving interpretation of these regulations or will have far-reaching precedential value, the archivists shall submit the pertinent materials, or representative examples of them, to a panel of senior archivists selected by the Archivist of the United States. The Panel shall then have the sole responsibility for the initial determination required in paragraphs (a), (b), or (c) of this subsection.

(e) If the Senior Archival Panel is unable to make a determination required in paragraph (d) of this subsection, or if the panel concludes that the required determination raises significant issues involving interpretation of these regulations or will have far-reaching precedential value, the Panel shall certify the matter and submit the pertinent materials, or representative examples of them, to the Presidential Materials Review Board.

(f) The Presidential Materials Review Board ("Board") shall consist of the Archivist of the United States, who shall serve as Chairman, and the following additional members:

(1) The Assistant Archivist for the Office of the National Archives;

(2) The Assistant Archivist for the Office of the Presidential Libraries;

(3) The General Counsel of the General Services Administration; and

(4) A person, distinguished in archival science, history or political science, who shall not otherwise be a Federal employee or official, nominated by the Council of the Society of American Archivists.

The Board shall meet at the call of the Chairman. Three members of the Board shall constitute a quorum for the

conduct of the Board's business, although each member of the Board may participate in all of the Board's decisions. Members of the Board may be represented by their delegates on those occasions when they are unable to attend the meetings of the Board. The Board may consult with officials of interested Federal agencies in formulating its decisions. To the extent these consultations require the transfer of copies of materials to Federal officials outside the General Services Administration, the Board shall comply with the requirements of § § 105–63.204 and 105–63.302.

(g) When the matter certified to the Board by the Senior Archival Panel involves a determination required in paragraphs (a) or (b) of this subsection, the Board shall prepare a final written decision, together with dissenting and concurring opinions, of the proper categorization and disposition of the pertinent materials. The Board's decision will be the final administrative determination.

(h) When the matter certified to the Board by the Senior Archival Panel involves a determination required in paragraph (c) of this subsection, the Board shall recommend an initial determination to the Senior Archival Panel, which shall retain the sole responsibility for the initial determination.

(i) When the Board considers a matter referred to it by the Administrator as provided in § 105–63.401–1(d), it shall follow these procedures:

(1) The Board will notify the claimant of its consideration of the claim, and invite the claimant to supplement at his discretion the basis for the claim.

(2) The Board will publish notice in the Federal Register, advising the public of its consideration of the claim, and describing the materials in question as fully as reasonably possible without disclosing arguably private or personal information. The notice will further advise that any member of the public may petition the Board within 15 calendar days of the publication of notice, setting forth the intervenor's views concerning the public or private nature of the materials.

(3) The Board shall take into account the positions maintained by the claimant and any intervenors in reaching its decision. The Board shall issue its decision, including dissenting and concurring opinions, no sooner than 20 days nor later than 60 days from the publication of notice in the Federal Register provided in subparagraph (2), above. The Board's decision shall be the final administrative determination. The Administrator will notify the claimant

and any intervenors of the Board's decision by certified mail, return receipt requested, and shall refrain from acting upon that decision for 30 calendar days as provided in § 105–63.401–1(d).

### § 105–63.401–3 Transfer of materials.

(a) The Administrator will transfer sole custody and use of those materials determined to be private or personal, or to be neither related to abuses of governmental power nor otherwise of general historical significance, to former President Nixon or his heirs or, when appropriate and after notifying Mr. Nixon or his designated agent, to the former staff member having primary proprietary or commemorative interest in the materials.

(b) Materials determined to be neither related to abuses of governmental power nor otherwise of general historical significance, and transferred pursuant to paragraph (a) of this subsection, shall upon such transfer no longer be deemed Presidential historical materials as defined in § 105–63.104(a).

### § 105–63.402 Restrictions.

#### § 105–63.402–1 Materials related to abuses of governmental power.

(a) The Administrator will restrict access to materials determined during the processing period to relate to abuses of govermental power, as defined in § 105–63.104(c), when:

(1) The Administrator, in accordance with § 105–63.401–1, is in the process of reviewing or has determined the validity of a claim by any person of a legal or constitutional right or privilege; or

(2) The Administrator, in accordance with § 105–63.401–1, is in the process of reviewing or has determined the validity of a petition by any person of the need to protect an individual's right to a fair and impartial trial; or

(3) The release of the materials would violate a Federal statute; or

(4) The materials are authorized under criteria established by Executive order to be kept secret in the interest of national defense or foreign policy, provided that any question as to whether materials are in fact properly classified or are properly subject to classification shall be resolved in accordance with the applicable Executive order or as otherwise provided by law. However, the Administrator may waive this restriction when:

(i)(A) The requester is engaged in a historical research project; or (B) the requester is a former Federal official who had been appointed by the President to a policymaking position and who seeks access only to those classified materials which he originated,

reviewed, signed or received while in public office; and

(ii) The requester has a security clearance equivalent to the highest degree of national security classification that may be applicable to any of the materials to be examined; and

(iii) The Administrator has determined that the heads of agencies having subject matter interest in the material do not object to the granting of access to the materials; and

(iv) The requester has signed a statement, which declares that the requester will not publish, disclose, or otherwise compromise the classified material to be examined and that the requester has been made aware of Federal criminal statutes which prohibit the compromise or disclosure of this information.

(b) The Administrator will restrict access to any portion of materials determined to relate to abuses of governmental power when the release of those portions would constitute a clearly unwarranted invasion of personal privacy or constitute libel of a living person: *Provided,* That if material related to an abuse of governmental power refers to, involves or incorporates such personal information, the Administrator will make available such personal information, or portions thereof, if such personal information, or portions thereof, is essential to an understanding of the abuses of governmental power.

§ 105–63.402–2 Materials of general historical significance unrelated to abuses of governmental power.

(a) The Administrator will restrict access to materials determined during the processing period to be of general historical significance, but not related to abuses of governmental power, under one or more of the circumstances specified in § 105–63.402–1(a).

(b) The Administrator will restrict access to materials of general historical significance, but not related to abuses of governmental power, when the release of these materials would:

(1) Disclose trade secrets and commercial or financial information obtained from a person and privileged or confidential; or

(2) Constitute a clearly unwarranted invasion of personal privacy or constitute libel of a living person; or

(3) Disclose investigatory materials compiled for law enforcement purposes, but only when the disclosure of such records would:

(i) Interfere with enforcement proceedings;

(ii) Deprive a person of a right to a fair trial or an impartial adjudication;

(iii) Constitute an unwarranted invasion of personal privacy;

(iv) Disclose the identity of a confidential source, and in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source;

(v) Disclose investigative techniques and procedures, or;

(vi) Endanger the life or physical safety of law enforcement personnel.

§ 105–63.402–3 Periodic review of restrictions.

The Administrator periodically will assign archivists to review materials placed under restriction by § 105–63.402 and to make available for public access those materials which, with the passage of time or other circumstances, no longer require restriction. If the archivists are unable to determine whether certain materials should remain restricted, the archivists shall submit the pertinent materials, or representative examples of them, to the Senior Archival Panel described in § 105–63.401–2(d), which shall then have the responsibility for determining if the materials should remain restricted. The Senior Archival Panel may seek the recommendations of the Presidential Materials Review Board, in the manner prescribed in paragraphs (e) and (h) of § 105–63.401–2, in making its determination. Before opening previously restricted materials, the Administrator will comply with the notice requirements of § 105–63.401(b).

§ 105–63.402–4. Appeal of restrictions.

Upon petition of any researcher who claims in writing to the Administrator that the restriction of specified materials is inappropriate and should be removed, the archivists shall submit the pertinent materials, or representative examples of them, to the Presidential Materials Review Board described in § 105–63.401–2(f). The Board shall review the restricted materials, and consult with interested Federal agencies as necessary. To the extent these consultations require the transfer of copies of materials to Federal officials outside the General Services Administration, the Board shall comply with the requirements of §§ 105–63.204 and 105–63.302. As necessary and practicable, the Board shall also seek the views of any person, including former President Nixon, whose rights or privileges might be adversely affected by a decision to open the materials. The Board shall prepare a final written decision, including dissenting and

concurring opinions, as to the continued restriction of all or part of the pertinent materials. The Board's decision shall be the final administrative determination. The Administrator will notify the petitioner and other interested persons of the final administrative determination within 60 calendar days following receipt of such petition. If the Board's decision is to open previously restricted materials, the Administrator will comply with the notice requirements of § 105–63.401(b).

§ 105–63.402–5 Deletion of restricted portions.

The Administrator will provide a requester any reasonably segregable portions of otherwise restricted materials after the deletion of the portions which are restricted under this § 105–63.402.

§ 105–63.402–6 Requests for declassification.

Challenges to the classification and requests for the declassification of national security classified materials shall be governed by the provisions of § 105–61.104, as that may be amended from time to time.

§ 105–63.403 Reference room locations, hours, and rules.

The Administrator shall, from time to time, separately prescribe the precise location or locations where the materials shall be available for public reference, and the hours of operation and rules governing the conduct of researchers using such facilities. This information may be obtained by writing to: Office of Presidential Libraries (NL), The National Archives, Washington, D.C. 20408.

§ 105–63.404 Reproduction of tape recordings of Presidential conversations.

(a) To ensure the preservation of original tape recordings of conversations which were recorded or caused to be recorded by any officer or employee of the Federal Government and which;

(1) Involve former President Richard M. Nixon or other individuals who, at the time of the conversation, were employed by the Federal Government; and

(2) Were recorded in the White House or in the office of the President in the Executive Office Buildings located in Washington, District of Columbia; Camp David, Md.; Key Biscayne, Fla.; or San Clemente, Calif.; and

(3) Were recorded during the period beginning January 20, 1969, and ending August 9, 1974,

the Administrator will produce duplicate copies of such tape recordings in his custody for public and official reference

---

ORDER

In accordance with the accompanying Opinion, it is this 30th day of December, 1983,

ORDERED that defendants' motion to dismiss is DENIED; and it is

FURTHER ORDERED that there being no material facts in dispute, summary judg-

ment may appropriately be entered on the issues of the retroactive application of *Immigration and Naturalization Service v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) and the severability of Section 104(b) from Section 104(a) and the other provisions of the Presidential Recordings and Materials Preservation Act, 44 U.S.C. § 2107 *Note* (1976) ("the Act");

ACCORDINGLY, defendants' motion for summary judgment is DENIED on the issue of retroactivity and GRANTED on the issue of severability; and it is

FURTHER ORDERED that plaintiffs' cross-motion for summary judgment is GRANTED on the issue of retroactivity and DENIED on the issue of severability; and it is

FURTHER ORDERED that, consistent with these rulings, judgment is hereby entered declaring that Section 104(b) of the Act is unlawful and void and that the public access regulations issued under that authority are unlawful and void; and it is

FURTHER ORDERED that judgment is entered declaring Section 104(b) shall be and hereby is severed from the Act, thereby preserving Section 104(a) and the remainder of the Act; and it is

FURTHER ORDERED that judgment is entered enjoining defendants and their agents from further implementing or taking any further actions pursuant to the existing public access regulations until such time as newly promulgated regulations become effective.